Before we begin, let me just indicate for the record and for the benefit of anyone who is listening to or will be listening to these proceedings, which are being conducted, of course, with the ongoing pandemic still ravaging our country and most parts of the world, that oral argument is being conducted in this matter, both with two of my colleagues appearing by audio and video from their respective courthouses. I am here in Philadelphia on other business, and so I am taking the bench. But what I wanted to make clear is that while we have both of counsel with us, they were not required to be here. I appreciate very much, I know the panel does, their willingness to appear in person to argue this matter. The policy has been that if either or any of counsel does not wish to be present physically for argument, they certainly will not be required to be present. But if all are agreed on being present for the presentation of their arguments, we will go forward that way. No one is compelled to be physically present here in light of the circumstances we have all endured for all too many months. So with that said, the work of the courts continues, and it continues with the case of the United States of America versus Francis Rhea. Am I pronouncing that name correctly? Thank you. I ask the question because I am, as my colleagues know, and it's not that I brag about it often, but I hail from the name is a very common surname, but it's pronounced Rhea out in central Pennsylvania. So I wanted to make sure I got that right. Mr. Sanders. May I please report? I'm Assistant United States Attorney Stephen G. Sanders on behalf of the appellant to the United States. I would respectfully request three minutes for rebuttal. Thank you. The rebuttal time is granted, and you'll notice that we do now have plexiglass at various points in the courtroom. It does impact to some extent the audio, my ability to hear you. Perhaps Greg can turn volume up a bit so that you won't have to speak too loud, Mr. Sanders. Let me just say at the outset, and I don't know that this is the way my two colleagues see it, but I thought I might lay this out so that at least in terms of the questions and inquiries I make, I've set out where my concerns are. And so what I'm indicating to both sides here before hearing from anyone, the issues that are inherent in the district court's application of only a two point sentencing enhancement for role in the offense, and the district court's refusal to apply the obstruction of justice enhancement, it appears to me that one, Mr. Rai needs to demonstrate that any procedural errors committed were harmless, such that the district court would sentence him to the same sentence, even with the enhancements that the government's arguing for. And secondly, and for the other side, that the government needs to show that the record before us is clear enough to determine that we should remand if we find procedural error here, with the instructions to apply either or both of the enhancements. So if you could, for my benefit in any event, address yourselves respectively to those concerns, I would appreciate it, Mr. Sanders. Fair enough, and I'll try to keep my voice up. Thank you. May it please the court, to start, Chief Judge Smith, where you left off on whether we can show that there's errors, the errors here were prejudicial. Under Rule 52A, as we set forth in our brief, I think we had a helpful chart at page 20 of our reply brief, right? Even correcting a one-level error, if that's all the court were to do, right, we would end up with a guidelines range that's higher than the sentence Mr. Rai received. And we think that under the court's current case law, Douglas, most recently, and Hester, this court basically said if there's procedural error, unless the district judge says I would impose the same sentence even were I to agree with the objecting party, that the guidelines range should have been different or higher in this case. Without that statement, this court cannot be sure that the same sentence would have been imposed. Well, we certainly don't have anything close to that in this record. I've read the seems to go further, doesn't seem to go further, it does go further. You would like us essentially to impose the enhancements or direct the district court to impose the enhancements. Let's look at the obstruction of justice perjury enhancement, for example. Is there a single case in our circuit from our court where a district court declined to apply the enhancement perjury? And we, the third circuit, then remanded with instructions to impose it. I don't know of a government appeal like that. All I can point this court to, and it's the case I stated in my brief, it was a defendant's appeal and it's a non-presidential opinion. But in Uniro, the district court imposed the obstruction on a different ground and erroneously, it turns out, so it never reached the government's argument that the defendant also perjured himself at trial. But on appeal, in an opinion by Judge Barry, I believe this court said that the defendant's testimony was so directly contrary to the verdict that it could have only been false, material, and loathful. And so they affirmed the enhancement on other grounds. They affirmed the enhancement. Correct. But that is not in any way on point to the question that I directed to you. No. My question really goes to, I'm not saying we lack the authority, but it certainly is a considerable leap from the situation you posit in your response to my question and what you're asking us to do. All right. Well, then let me take it this way, Your Honor. If you agree with us that the verdict establishes falsity and materiality, the only arguable gap left is willfulness. And there really was no dispute by Mr. Rea below that if his testimony was false in our material matter, that it was the product of mistake, innocent misrecollection, or faulty memory. He raised none of those concerns. His argument was I didn't testify falsely. And so it's hard to conceive on this record, given the number of denials on the number of topics and how many times he did it, that could have been anything other than willful. All right. So you're arguing that willfulness is plain on the record because of that? Let me ask you one question before I yield to my colleagues. Did the district court make a finding either way as to whether Mr. Rea's testimony about his instruction to the campaign workers, the instruction of campaign workers to bribe was willful and not a product of mistake, confusion, or faulty memory, anything of that kind? He did not make a finding on that. And I think even if you look at the judge's decision, I don't know that there's even a miss, even though just before reaching the obstruction enhancement, the judge agreed that at least a two-point increase for manager or supervisor was required, saying that the jury found that he gave these instructions. And so, yes, I'll give at least two points. And I think those two findings are at war with each other. To the extent there's a no falsity finding, right, it can't be reconciled with the finding just a few lines up that Mr. Rea noted at least an increase for being a supervisor or a manager, right? He must be given the directions. And Judge Martini implicitly found that he did, agreeing that that's what the verdict established. And yet when we got to the obstruction enhancement, I think he did what this court said you can't do in the politics, since you wrote that opinion, said you can't rely on discomfort or other such require the enhancement. Well, it's an overarching matter with respect to the political and maybe though it's not stated explicitly there, what can be drawn immediately is that what we did was to extend the obligation of the district court to make findings. That is that the district court needed to address the elements either with imposition of the enhancement or with refusal to impose the enhancement, which if anything, underscores the need for the district court to do its job and make findings. I agree, Your Honor. Let me ask my colleagues here to get in at this stage. I had a question actually. No, go ahead, go ahead. Vic Ray is short of finding that he ordered his associates to bribe voters. Why is that necessary? Because Your Honor, the way this case was tried, right, was basically a credibility contest between our witnesses, essentially, who said they did this in his direction. Mr. Ray, who got out there and said he knew nothing about the scheme and didn't instruct anybody to do anything. And I think when the jury is given that binary choice, and I think even Judge Martini in his Rule 33 opinion recognized that the way this case was tried, the government had to prove that Ray directed his campaign workers to bribe voters. That's in the Rule 33 opinion. I think it's on page 981 of the appendix. When we have that understanding, I think we have to say the jury necessarily found that he gave those instructions. And even if it doesn't reflect that, Your Honor, it certainly reflects a finding of knowing and intentional participation in the are denials of even knowledge that his co-conspirators were out there doing this. And those those two things can't be reconciled. Thank you. I have a couple of questions. Background. The first is I'm hearing a lot of background noise. Is that me or is that someone else? The things are fairly quiet in here. But Wilmington, I know, can get a little crazy sometimes. So that may be the source of the background. It's not Jersey, but it's still it's still wild at times. Well, yeah, you're right. The. The you've got his hope open city council. There's a slate of candidates that Mr. Raya wishes that people vote for. And there's an initiative that would weaken rent control laws and. You would pay $50 to those who would vote your way for the slate of candidates for the initiative. And in my understanding correctly, that the government proposed to the court that this should be level 18. Criminal history one, so be 27 to 33 months. Is that correct? That's correct. That seems to be an awful lot for something that is. Compared to the kind of cases we see with regard to. The mayor. But their counsels in the electoral process. Why so high for this particular case? I mean, that's maybe a question that I asked about the sentencing commission. I mean, the the sentencing commission, the PSR comes out with 16 one, which would be 21 to 27. You're even higher than that. Correct, your honor. And that's because the probation office had a policy of not making any recommendation on obstruction enhancement when that's based on perjury at trial. It's not that they refused to find it. They said in response to our objection that when a defendant testifies a trial in front of the district judge, it's the district judge who has had the opportunity to view the defendant and the government's witnesses and to make the lack of that two level obstruction that took the defense level from 27 to 33 to at least two levels lower that. And of course, Judge Martini, by not finding the aggravating law enhancement, we saw reduced to two levels even further. Yeah, I realize that your appeal is only on procedural issues as opposed to the merits of the actual sentence. But it just seems in this kind of case that compared to the types of cases we see, 27 to 33 months is an awful lot. Well, your honor, as you know, that we have not changed the substance to really make a good sentence. Yeah, yeah, yeah. I saw the footnote. Yeah. Because I I'm sorry, it's we say there ain't no doubt about it. You didn't do that. But let me ask you a question on the on preserving your objections on the aggravating role objection under three point one. Don't you need to explain the basis for your objection to the district court in order to get rule 52 a to come into play? Yes, you have to put the district court on notice of what it is you want. And I think we did that in three different ways. We stopped the four level enhancement. We objected at the end of sentencing when only the two level enhancement was imposed and during the sentencing when Mr. Reyes counsel said no increase was warranted under three B one point one. The AUSA responded twice and I will get the. Give me the page. It's a ten ninety four and ten ninety five twice mentioned mentions manager and supervisor, not just organizer and leader. And the district judge himself understood that this guideline provision requires a has different degrees. And even though we thought the four level enhancement, he went down to two levels. So he understood that depending on what the facts showed, a different enhancement might be might be warranted. So we think we've adequately preserved that and recited the case in the Sixth Circuit, although it was a defendant's appeal where the defendant objected to the four level enhancement and the court said that sufficiently preserved an objection that she should only have gotten the manager or supervisor enhancement for three levels. I think my time is up. We'll keep going. We don't have any other where is it on pages ten, ninety four, ten, ninety five. For the government. What do you want? You can do it on the bottom. That's fine. To be efficient. At ten ninety four, it's right at the top of the page, lines one and two, the carrier sentence, the AUSA says there's no requirement that there be consequences for the conspirators if they don't follow the direction of the manager and leader. Right. So that's that's a reference to three B, one point one B. And again, at the bottom of the page, carrying over. He says, I don't see on page ten, ninety five, I don't see how we conclude otherwise that he was a manager and organizer, a leader. So again, he's using the different buzzwords of the two different possible enhancements. And I think that was sufficient to put the judge on notice. And of course, we have cited the cases from the Eighth Circuit and the First Circuit saying that this is a strict scheme and it can't be modified by the district court. And that could tell you the Eighth Circuit reversed on this very ground. So if I understand what your argument is, essentially under step one, that the proper sentencing range was not calculated. And then after that, we I'm not quite sure as to whether the court departed at step two or three. Do you have any indication as to what the court did? I couldn't figure it out from the transcripts. No, I couldn't either. The district court didn't even follow the three step process, did he? That's correct. And that just highlights another area that affects the sentencing proceeding. I know the judge said he was departing. I think at the end of the day, he was really varying and he was using the terms interchangeably. But if he did depart, there's no there's no nothing in the statement of reasons, nothing on the record that shows us what the extent of the departure was. And that would frustrate any appellate reviewer if we had not. Well, it has frustrated at least for my part, because there's there's one point in the statement of reasons, and I'm forgetting exactly where it was, where explicitly departure and variance are used at the same time. So we haven't even gotten to a role in the offense yet. But before we transition to that, I assume you would agree and probably would agree that our jobs, all of our jobs are made more difficult by the institutional fact that in a criminal case, we don't accept an extraordinary cases, very unusual cases. And I don't know that I've had one in all my years as a judge, as a trial judge where specific findings were asked for. We use we ask for a general verdict. We get a general verdict. That's what we're stuck with here on the one kind of conspiracy. So we don't know much about what the jury actually relied upon, credited and what and what they didn't necessarily imply from their verdict. It seems to me to be a pretty tough road. Oh, for either of you, if you're if you're invoking that that standard. So here's my final question on this point. How would the hypothetical fact that Mr. Rea instructed the campaign workers to bribe voters in any be in any different position from the brought to his club? And couldn't the jury have convicted him of conspiracy without believing either of those facts? Neither is an element of conspiracy. No, theoretically, a jury could convict right by saying you have, you know about the scheme and you do something to further it. In this case, our proof of that knowledge and that intent was based solely on those instructions. Right. We didn't have it there. No one argued information right that even if you don't believe our cooperators that he said that he gave his instructions, you can still find him guilty because he took some action further into the scheme and did it with knowledge. We didn't we didn't make that argument. And I don't think that's the way to parse this verdict. Even Mr. Rea, in his sentencing brief, recognized that his juror that his testimony was at odds with the cooperators on this very point. He referred that to the district court, but that's exactly where he led the district court into error, as he then said. But there's nothing to corroborate that testimony. And so it's not sufficient on which to be finding a perjury. And as we pointed out, Judge Martini sort of interpolated a corroboration requirement into the guideline and basically raised the goalposts or them. But there's no such requirement. If we had direct evidence of the conspiracy, obviously, I don't think Mr. Rea would testify. But that seems to be what he was demanding, some sort of videotape or, you know, audio tape of the conspirators getting together and discussing the conspiracy. Their testimony corroborated each other. It was corroborated by the two guilty pleas that we put forward, and it was corroborated by the voters who came in and admitted that they accepted $50 in exchange for providing the mail-in ballots. All right. Gentlemen, before we, colleagues, before we turn to the role in the offense enhancement, are there any other questions that anyone would like to ask? And of course, there will be a rebuttal on the perjury enhancement. I have a question once we're done with that second aspect. Go ahead. All right. Moving to the role in the offense enhancement, I'm struck by an anomaly here, and that is that both sides are saying that the District Court implicitly found that Mr. Rea was a manager or supervisor, but not an organizer or leader, right? Which seems odd, given the matrix that we're dealing with here. So isn't the District Court's judgment here equally consistent with an implicit finding that Mr. Rea was an organizer or leader? And the two-point enhancement, I think, is equally available under the sentencing guidelines, whether Rea was an organizer or leader or simply a manager or supervisor, right? That's correct. The difference is, right, that for 3B1.1c, the two-level enhancement requires a scheme in which there are less than five participants. And the PSR recommended this enhancement because it found, and Mr. Rea didn't dispute, that there were at least five participants in the scheme. We had the three testifying co-conspirators, and we have the two additional guilty pleas from defendants Braxton and Ms. Camus, who said that they participated in this conspiracy. In fact, Braxton was charged originally in the same indictment with Mr. Rea, with conspiring with each other. And then we had Ms. Centron also. So there was no dispute that this conspiracy involved at least five or six people. And so if that's the case, then imposing only a two-level enhancement, Judge Martini necessarily, after rejecting our argument that he was an organizer or leader, and then saying, well, I find that kind of extreme, you know, I'm uncomfortable doing that, but maybe at least, you know, he gave some direction, maybe the two-point enhancement will apply. So we think, you know, deducting from what he said, that he found him to be a manager or supervisor and therefore gave the two-level enhancement. That we've pointed out is error because if he is a two-level enhancement, it's a three-level enhancement. But we think the four-level enhancement was most amply justified on this record. And I'll first, if you bear with me, talk about the legal errors that occurred. Judge Martini never considered the factors in application. I was about to ask you that. The sentencing guideline application note gives us seven, a non-exclusive list of factors. They're not even touched on during the sentencing proceeding, are they? That's correct. What Judge Martini said was that there was no evidence that Mr. Rea threatened his campaign workers with consequences. And while the analysts said no, there was no evidence, and rightly said that's not required, I would point out that two of the witnesses testified that they were essentially financially beholden to Mr. Rea, right? They were longtime friends of his. He would take them on vacations. He would spend money on them. And both said, when asked why they participated in this direction, because they thought that those benefits to them would end if they didn't do as he told them. So that was certainly some evidence of control. I wonder, you know, the Chief Judge just mentioned that there are factors in the note, and you valiantly try to argue them, but isn't this best left to the district court in the first instance to weigh these things properly? Well, with sufficient guidance, maybe I would say yes. What is sufficient guidance? It seems to me Judge Chigaris has made a very good point. In fact, a point that by suggesting to us quite accurately that, escorted by the record, Judge Martini did not touch on any of these seven. Isn't your request to us to send this back with a direction, a direction to impose, well beyond anything we ought to do? Why isn't the government just satisfied to say we've got procedural error here? We've got procedural errors in numerous places. We don't know the difference in the record from a variance or a departure. The point right here is that Judge Martini didn't even allude to the seven points in the application note. Why isn't it enough for the government to just point, for us to just point out these errors and send it back? I think that that would be adequate. I think at least we point out that that enhancement has to go up by one, right, because there had to have been at least a three-point enhancement under his own reasoning. What I meant by sufficient guidance is that there are errors in this record, kind of like Napolitan, right? This court gave guidance to the district court on remand. You can see, again, in the well enhancement, Judge Martini is basically at odds with the verdict, saying, you know, he was essentially a passive beneficiary of the conspiracy, and that does not square with the testimony that he orchestrated this, right? He used his own money, bankrolled it with $100,000 of his own money, but he used Blue Water so that they could pay two lump-sum payments to Blue Water and then not report the $50 bribe payments that Blue Water cut to the voters on the elect forums. He did that. He instructed them to bring the unsealed ballots back. He inspected them, and he also instructed them to use these declarations, right? I just think things I'm concerned adding four points is extreme. Those are the kinds of errors that Napolitan pointed out. You can't do it. If the fact's warranting the enhancement, you can't rely on concerns that are untethered from the guideline to not impose enhancement that's otherwise warranted by the facts. So that's the kind of guidance I was referring to. Judge Ambrose, I want to make sure you have an opportunity. Yes. Obviously, you have strong arguments that there are procedural errors here, but Mr. Ray has been in prison for many months, probably, I guess, about eight or nine months. Does the District Court even have authority to amend his sentence at this point? I want to make sure I heard your question correctly. You say he's been out of prison for many months, right? Correct. Does the District Court even have authority to amend his sentence at this point? Yes, he does, Your Honor. We've had several sentencing appeals where we've appealed what we viewed as erroneously low sentences, and this court has vacated, and the defendants would have to go back in if the judge, in fact, decided to impose a higher sentence. What your answer is telling us, at least in part, is that the judge's ruling with respect to compassionate release doesn't have an impact on whether or not the original sentence was correct or at least correctly explained. That's correct. But, of course, the District Court, upon resentencing, would have the authority to take into account factors that occurred, incidents that occurred after the original sentence for purposes of whether or not he ought to impose a variance, ought to allow a variance, right? He can do that, and we've had many cases in our district where we've put off sentencing in cases, right, where the defendant has played or been convicted, or we put off the report date if COVID is a concern. So there are many ways this can be handled. What I'm looking for is, is there precedent for increasing a sentence? This was a three-month sentence. How much did he serve, actually, before he was released compassionately? Two months, Your Honor. So he's one month short. Is there any precedent for increasing the sentence? I mean, I know in Jackson, which is a case we've appealed twice, the first time, I think the defendants were already out by the time the case went back for resentencing. That was the appeal from Judge Hayden's sentence in the child abuse case, and on remand, Judge Hayden did impose a more severe sentence on one of the defendants, and that defendant, Caroline Jackson, I believe, had to go back into prison. Well, and this is not the case where we would be remanding after vacating a judgment of sentence which found errors in the conviction. This is solely a remand relative to errors that occur during the sentencing process. That's right. And there is a right to appeal in the statute, actually. Right. I get that, but is there a precedent? So other than the case you said with Judge Hayden, you're saying that's the precedent you have for somebody increasing the sentence on remand after the defendant's been released? That's the one that most readily comes to mind. If I can't think of some more while I'm sitting down, while Mr. Barton is making his argument, then if you want, I can certainly research and I know sometimes defendants will raise a double jeopardy complaint to that, but when the government has rightly appealed a sentence as being too lenient or as being infected by error, and those errors correcting them could lead to a higher guidelines range, I don't think there's any issue. It wouldn't make much sense to statutorily provide the prosecution a right to appeal a sentence if ultimately a showing of error found to be error by an appellate court said you can't have a sentence that's any more than what was originally imposed, what is a matter of policy. I agree. Except you could think of it like qualified immunity. At some point, you could set the table for what the clearly established law is that would apply to the next case, and that's what I'm trying to find out. I want to explore that, and if you could give me some more precedent, perhaps we'll send in a 28-J letter, I'd appreciate it. I will do that. Good. Anything else from Mr. Sanders? Judge Karras, Judge Ambrose, anything further until we have Mr. Sanders back in rebuttal? No, sir. If not, thank you. I'll have you back. Thank you. Good morning. Excuse me. May it please the court, my name is Lee Vartan, and I represent the appellant, Francis Rea. I'll start, Chief Judge Smith, with your question about harmless error, because I think that really cuts to the heart of much of my presentation this morning, or much of the dialogue, I should say, this morning. It's our position that even if one or more procedural errors were committed at the district court, that any such error was harmless. We say that for three main reasons. The first reason is that the sentence the district court imposed here was a product, we believe, of both a departure and a variance. I say that because I know that the record may have used the two words interchangeably, but there is a course, the core two, that makes explicit that Judge Martini, in this particular case, granted both a departure under 5H1.11, as well as a variance under 3553A factors. What's important about the departure and the variance in this particular case is that the departure and variance, the amount of it, was not in any way connected to or correlated with the guidelines. What I mean specifically by that is at no point in the sentencing transcript does Judge Martini say that I'm departing six levels or varying six levels from the guidelines as calculated at step one or step two of the three-step process. Instead, what he says, and I would submit that the record is quite clear on this point, that he was arriving at his sentence due to a variety of different factors and that the guidelines, to quote from Zbilski, were not informing his ultimate sentence because he believed that the guidelines were too strict, too punitive in this particular case. Again, quoting from Zbilski. All right. It's your burden, though, is it not? It's your burden. It is my burden. And this is not what I would say is the comparatively easy case where there's an explicit reasoned statement made by the sentencing judge on the record, right? I think certainly the statements could have been clear, but I would... Statements. Any statement that indicates that the sentence would be the same if it came back. You cited Zbilski, and Zbilski says, well, it will usually be difficult for an appellate court to conclude with sufficient confidence that the same sentence would have been imposed absent a clear statement to that effect by the sentencing judge. We don't have a clear statement to that effect, right? And if I'm correct about that, then it's correct. It's difficult for us. Two things on that, Chief Judge. First, when the government was presenting, the government seemed to heighten the standard to say we cannot be sure if the sentence would be the same. That isn't the standard for purposes of this court's review of the standard. Is there a high probability that the sentence would be the same? And applying that standard to the record before the district court, I believe, and I would say in particular pages 48 and 50 of the sentencing transcript, where Judge Martini makes explicit that he is departing and varying for very particular reasons. And I would quote from the district court in noting that the court pointed to Mr. Ray's extraordinary life history and even went so far as to say very explicitly on the record at page 48 and page 50 that the reason I'm departing and varying in the way that I am, and I'm certainly happy to quote directly from the district court that's helpful, but the reason I'm departing and varying in the way that I am is due, Mr. Ray, to your extraordinary life history. And certainly the transcript spends, the district court rather, spends considerable time at sentencing. There are multiple pages in the transcript where the district court quite clearly chronicle all of that extraordinary life history. How can we say, looking at this record, that notwithstanding the position that was amply demonstrated by the defense, that there was very significant contribution to the community at that he had erred or thought that he might have erred in his calculation, that he would still impose the same sentence if the court of appeals were to remand? Well, I would say, again, from the appellate, from Mr. Ray's perspective, the sentencing transcript is quite robust. And Chief Judge, I would point you to two particular comments in particular, two particular comments that I think make the point well, that there is a high probability that the sentence would be the same for the same reasons. Judge Martini said that in his 18 years a judge, plus the time before as a defense attorney, plus the time before that as a prosecutor, he had never seen a defendant present as Mr. Ray's work quite like that, extending over decades. He also made very clear that Mr. Ray's works would have extended if he went through them work by work or letter of reference by letter of reference. It would have extended the sentencing hearing by several hours, is what he said in the record. So based upon those two, I would say, extraordinary comments, it is clear that there's a high probability, if this case were remanded by this court, that he would impose the same sentence. I would also... To me, given the confusion here, at least confusion I see, into whether a variance or departure was imposed, at least in one instance, that your argument is that Judge Martini would have imposed this sentence, irrespective of what any guideline says. Either the one that he determined was applicable, or whatever should have been correctly calculated. I think that is accurate, and that's why I started my argument by saying that there was no stated correlation anywhere in the record between the ultimate sentence of three months and any what we now, fortunately, have as non-binding guidelines. Isn't it really, sub silentio, a suggestion that, you know, to consider the guidelines at all, this is the amount that I consider an appropriate sentence? No, I don't believe so, because again, although the three-step process was not adhered to as closely as we may all like sitting here this morning. Excuse me, as closely as we'd like, or it was completely ignored? It was largely ignored. Okay, I think that it wasn't mentioned at all, but we'll agree to disagree. But in terms of the, again, the robustness of the record, and I use that word for a particular reason, certainly Judge Martini did consider the 5H1.11 departure. He considered the 3553A factors. Very relevantly, too, to a question that you asked the government chief judge, is the fact that he also considered Mr. Rea's medical history. So although it didn't rise to the level of a standalone departure for his failing health, certainly that factored into the sentence that was ultimately imposed here, meaning three months. And again, Judge Martini makes that quite clear on pages 48 and 50 of the transcript. So to your point, and the fact that this case or this matter has already been remanded for resentencing effectively once, and we are in the middle of the COVID-19 pandemic with plexiglass surrounding us, I think it is, again, there's a high probability that if this case were remanded for resentencing, in light of Mr. Rea's continued failing health, in light of the fact that there was a pandemic, in light of the fact that he already granted a petition once under 3582, it's quite possible that if this court were to remand for resentencing, that Judge Martini would sentence Mr. Rea to a lower sentence, perhaps straight probation, as opposed to a three-month custodial sentence. And I recognize, certainly, in providing my answer to the court, that there's some degree of surmise in all of this, and that I'm sure provides some consternation. But I come back to what the government started with in its presentation, and I'm quoting, we cannot be sure that the sentence would be the same. That is not the standard under Zabielski. It's a high probability. And when you look at a 52 or 53 page... I just wonder, we've talked about how Judge Martini didn't say anything specifically about imposing the same sentence, regardless of the enhancements. Does it matter that the case went back to him while it was on appeal? I mean, he knew the sentence was being appealed, and he still didn't say anything. I mean, does that cut against your position? Respectfully, no, Judge Chigares. And I would say the reason for that is these matters were never in any way briefed before Judge Martini with respect to the 3582 petition. So the matter before Judge Martini with respect to compassionate release really was what was the status of Mr. Rea's health, and did it rise to the level of a petition for compassionate release under 18 U.S.C. 3582? So there was no briefing on these issues. There was no thoroughgoing consideration by either side. He knew the government appealed the sentence, right? He certainly was aware of that, Judge. Okay. Thank you. Zabielski has a predicate, and the predicate is that the court must explicitly state that the enhancement has no effect on this sentence imposed. And if you don't make that explicit statement saying, in effect, I'm going to sentence you to X no matter what, it will usually be difficult to ascertain that the error was harmless. So in this case, what the government has done is they're saying, look, there are so many procedural questions we have here. We want the court to address them because we've had, I guess, for 14 years now, a certain process that we go about sentencing. Go through the sentencing guidelines. You don't necessarily have to follow them, but you have to agree as to what they are, the range. Secondly, you rule on any departures. And then third, in conjunction with the 3553A factors, you determine what applies to this particular individual, and in that case, you may vary. Yes, pages 48 and 49 talk about a variance. Page 50 talks about, I don't know what I did. I don't know if it could be a departure, it could be a variance. So who knows? But this almost seems like a law school exam in terms of what procedurally went wrong. Just on obstruction of justice, there are three possible errors. Suggesting that the government must provide written corroboration of the crime, which is a appendix 1095-96. I don't know of anything that requires that. Two, a failure to accept the facts that are necessarily implicit in a jury verdict where you have testimony of witnesses that contradict Mr. Raya's testimony. And thirdly, the failure to make explicit findings as to whether Mr. Raya perjured himself. So on those, let's just stop with those three. What tells you that there was not a procedural error with regard to each of those particular matters? Well, with respect, I'll start with the obstruction and the jury's verdict. That's what we're talking about obstruction. I said there's three possible errors just on obstruction. Where is it that our court has said that you have to have written corroboration of a crime? There need not be written corroboration. I don't think that Judge Martini was applying a new requirement to 3C1.1. I don't think that he was saying that there needs to be an email or something that's positive in order for the government to meet its burden. Well, look at page 1095. It says, as far as the argument that an assessment of two points for obstruction of justice is concerned, I have a difficult time with that. Especially in the sense that there's no other than testimony. There's no corroboration in any form, such as emails, letters, or recordings that would be helpful to this court in determining that there was an obstruction of justice. I can't find anything that says that that's a requirement. I don't believe it to be a requirement, Your Honor, but I also don't believe that Judge Martini was imposing any such requirement. I think he was considering the factors under 3C1.1, namely falsity, materiality, and willfulness. He was using the lack of evidence with respect to corroborating evidence in weighing whether the government carried its burden with respect to 3C1.1. What I would say specifically to your question, this was alluded to in some of the questioning of the government earlier, is the jury's verdict does not compel a finding of falsity with respect to Mr. Rea's testimony. The key here, and again, it was alluded to in some of the questioning of the government, but the key, Judge Ambrose, is the fact that this was a single count indictment. Mr. Rea was charged with one count of conspiracy. The elements of the Travel Act, that Mr. Rea knowingly joined that agreement, and that someone, albeit not Mr. Rea, committed an overt act in furtherance of the conspiracy. The jury was specifically instructed on, obviously, the elements of conspiracy. They were told, most specifically, that the object of the conspiracy here, voter bribery, need not even have been achieved. I agree that irreconcilable inconsistency is the appropriate standard for this court. That is what this court applied in United States versus Johnson, but there's nothing inconsistent about Mr. Rea's testimony and the ultimate verdict. The jury could have found that Mr. Rea and the others conspired to commit voter bribery, but were never successful. There's no way to speculate as to what was happening in the jury room. There was certainly no special verdict form. All we can say comfortably today on this record, as it stands, is that Mr. Rea was convicted of a single count of conspiracy. If you have 14 witnesses and three of them say X, and Mr. Rea gets up and says Y, and then says of those who say X that they are, quote, liars, close quote, is it logically you either believe one or the other? If you find him convicted, guilty, then you believe the witnesses. And let's just, but even skipping that, I'll skip that for you. If that issue is joint, doesn't the district judge at least have to make an explicit finding as to whether he perjured himself or not? In other words, the argument that you're now making, the district judge Certainly it's the government's burden to show falsity, materiality, and willfulness. And I would submit to the court that, again, the record- It's not the government's burden to have the court make a decision as to whether Mr. Rea perjured himself. It's the court's obligation, the court's duty to do that after the issue has been joined by the government, which they did do here. I certainly understand Your Honor's question. What I would say is the facts before the district court are considerably different, in my view, than they were in Neapolitan. If we were to go back and look at Neapolitan in that particular- That's not answering my question. My question is, if the issue has been joined, doesn't the judge have to make a decision in sentencing as to whether Mr. Rea perjured himself or not? Well, he did make a decision. He found that Mr. Rea did not perjure himself. Where is that in the sentencing transcript? I think it's implicit in his decision not- Tell me where you think I should find it implicit. I wouldn't be able to point, Your Honor, to a specific page reference. I'm saying it's implicit in his decision not to apply the enhancement in this particular case. When it comes to us on appeal, that doesn't work. We need to find something that tells us that he found that he perjured himself or he didn't perjure himself, and I guess also, and why. Because it seems logical, back to my initial question, that if three witnesses say X and he says Y and he calls the people who say X liars, if the jury finds against Rea by convicting him, they implicitly find just the opposite of what you said. They implicitly find that he did perjure himself. But, again, Matt, Your Honor, as far as I saw from my review of the case law and also what the government submitted, I don't think there's any case that's been submitted to this court where someone, where the obstruction enhancement was applied, where someone was charged with conspiracy as opposed to a substantive offense. If you look to Gray, the government mentioned Jackson. If you look to Napolitan, all of those particular cases involve a one-to-one comparison in the sense that the defendant was convicted of, for example, in Gray, possession of a weapon. That particular defendant testified he didn't possess a weapon. Those verdicts were, the verdict was irreconcilably inconsistent with Mr. Gray's testimony. That's not the case here. What was he convicted of? Conspiracy to violate the travel act. I have no further questions on obstruction of justice. You want to go to roll? My colleagues want to go start with that. Judge Shigaris, anything else on the obstruction before we move to roll on the offense? That's okay. We can move on. I have nothing. All right. Thank you. You say that the district court implicitly found Mr. Ray to be a manager or supervisor, but not an organizer or leader, which as I pointed out earlier, seems a bit anomalous that you and the government are taking the same position with respect to that implicit finding. Certainly your client is better served ultimately by being a mere manager or supervisor, but I'm curious as to how you know this from the record. Isn't, as I asked Mr. Sanders, isn't the district court's judgment here, given the number of points that were allotted, isn't the district court's judgment equally consistent with an implicit finding that Mr. Ray was an organizer or leader? No, because I think, again, based upon, and it's important, I think, in addressing the chief judge's question to remember that this was a trial where Judge Martini had firsthand opportunity to see, hear, and evaluate all of the witness testimony, and having done so, he made a determination that certain of the testimony saying that Mr. Ray directed certain things or had the ability to direct certain people was not accepted by him. Do you concede that there's, is there any dispute that there were five or more participants here? It was an issue that was never addressed below on the record. Based upon my review of the record, it does appear to me that there would be five or more participants. Right, right. Okay, so we begin there. What other findings as to anything did Judge Martini make that would suggest this was two points, three points, or four points? A, B, or C, quite candidly, it looks to me as if the district court wanted to impose two points as opposed to four or even three, and that's where he went, but I can't find here in the record any explicit findings that point to any of, any application of A, B, or C. Again, I don't know that there is an explicit finding to be found, but certainly Judge Martini was aware of this circuit's case law. Judge Martini was no doubt aware of Helbling, and there is an obligation under Helbling this court has found that to be an organizer or leader, you have to exercise some degree of control over other participants, other members of the conspiracy, and again, having sat through the trial, having been privy to all of the witness testimony firsthand, there was ample record, there was ample evidence in the record for Judge Martini to find that Mr. Rea did not exercise the requisite level of control, and I can, I'm certainly happy to go through the facts that would support that finding. Now, we have a question. Chief, may I ask a question and follow up to your question? Yes, sir. It seems that we're all in agreement that there are five participants. With a two-level enhancement, it seems like if there's five participants, either you're going with zero, three-level, or four-level. Can't be two. I think that Judge Garris and Judge Amber, I think that you're both correct about that, but then not to repeat myself, and I won't go through all the same arguments again, but we're back to where I began my discussion this morning with harmless error, because certainly that would be only one additional point, so instead of starting at a 14, 15, to 21 months, you now move to a guidelines offense level of 15, and I would submit to the court that based upon this record, and I do believe it is robust, that there's a high probability, even with that one additional point, that Mr. Rea would receive the exact same sentence for the exact same reason. That's like going from first to third across pitchers, ma'am. You may be right. I wouldn't bet against you. The point is that there is a process that has to be done in order that we can have meaningful review, and that's where this case hits procedural problems. I certainly understand the court's concerns and appreciate the court's concern, but I come back to the language in Cebilski, which I do believe here is telling, because ultimately what this court held in Cebilski is that with respect to that particular sentencing, that particular trial court, the guidelines did not inform in any meaningful way what that judge was doing, meaning the judge found that the guidelines for that particular defendant were too severe and decided to, I think in that case, vary and depart downward to an offense level of 24. The same thing is true here, and that's why I started the presentation by saying that there was never a point in the record where Judge Martini said that I'm departing or varying by six levels. Now, the government, in its reply brief, Mr. Sanders referenced his chart on page 20 and he calls it a six-level discount. There is nothing so explicit in the sentencing transcript to say that Judge Martini was only departing by six levels or varying by six levels. What the transcript does say is that he believed, for the reasons stated in 3553A, 5H1.11, for Mr. Ray's health and his extraordinary life history, that a three-month sentence was the appropriate sentence. Isn't there a basis, ample basis, in the record to say that 14, from 14 to 8, was going six points, departing six points? Certainly, doing the math, no question, but there was never anything so explicit in the record tying the amount of the departure or variance to a particular, there was no, at no point did he say I'm departing six levels or varying six levels. That's not anywhere in this record. And I would also note that an important part of Zabilski, coming back to Judge Ambrose's question, is, what Zabilski was concerned with is, did the sentencing court arrive at a just sentence? Zabilski specifically said there was less consent. That's the merits, that's the merits. Here, there's a check the box, if you will. If I'm wrong in terms of how I calculate the sentencing guidelines, for example, the government would say, this person again, level 14, it should have been restriction of justice. But if, and if I'm wrong in terms of the way I depart down by six levels or perhaps eight, I nonetheless will sentence to three months, no matter what. That's the box that has to be checked, and it wasn't checked here. You can say it's implicit, and I wouldn't bet against you in terms of the outcome. But again, we're talking about what needs to be done procedurally for meaningful review by an appellate court. I understood, and Judge Ambrose, you're correct, that's not anywhere explicit in the record. But in referring to Zabilski, what I was saying is the chief concern in Zabilski, as your honor well knows, is, was there a just sentence? This court specifically said, we're less concerned about adding or subtracting two points in mechanical application of the guidelines post-Booker. And so he's bringing that- Talk about just sentence. Zabilski talks about whether the court explicitly states that the enhancement has no effect. So no matter what, it's not going to have any effect on my sentence, no matter what you do, if you appeal this government. Well, Zabilski, from my vantage, speaks about both. But I think that it's important in considering whether there's a high probability that the same sentence would be imposed for the same reasons, to remember here that there was no significant pushback in the record over the 5H 1.11 from the government at the time of sentencing. In fact, on the record, explicitly said by the government was that Mr. Ray should get credit for his charitable works, for his good works, it should be factored into 3553A. The government, of course, is not challenging at this point, as the chief judge noted at the outset, the substantive reasonableness of the sentence. So when you factor in both the robustness of the sentencing transcript, and also quite candidly, the government's position at sentencing, even on this appeal, it's incredibly likely, certainly highly likely, that the sentence will turn out to be the same for the same reasons. Because even the government at sentencing recognized that Mr. Ray's charitable works were very significant and should be factored into the sentence. I think effectively what you're doing is making an appeal to our intuition about what Judge Martini would do. And I'm not going to argue that point with you. However, as a reviewing court, our concern is that we have a record, not intuition, from which we can make the determinations that need to be made concerning the propriety of the guideline calculation, the propriety of any departure or variance, whatever may have occurred here. And I think we've pointed out to both sides concerns we have about whether or not those findings and statements were in fact made by the district court. Let me ask you at this point, Mr. Varden, if you have anything else on either of the enhancements that you'd like to bring to our attention. I guess very briefly, and this was stated I think clearly in our brief, it's important to remember that the standard of review here on the procedural errors is clear error because the district court's decision was based upon its findings of fact and not on its interpretation of the guideline. So I think that, of course, needs to inform and frame out the entirety of this morning's discussion, that it's a clear error standard of review and that Judge Martini sat below as not only the sentencing judge but also, more importantly, the trial judge. To my colleagues, further questions of Mr. Varden? No, thank you. I have none. Thank you very much. Thank you, Chief Judge. Mr. Sandler's rebuttal. Here's where I watch the clock a little more closely. I will be very pure, Honor. Two things on the harmless error argument that my friend, Mr. Bartrand, said. He keeps misstating the standard. The standard isn't what would happen at the sentencing, at the resentencing where this court's remand. He has to prove that the same sentence would have been imposed. And he keeps relying on Zabioski, but in Zabioski, the district court nullified the effect of any potential error by going down, right, the imposed enhancements, but then it granted a variance that was so far below what the guideline range should have been that it went underneath it. We have a subsequent case, Hester, right, where Judge McNulty specifically said, if I'm wrong about this four-level enhancement, I'm going to grant a four-level variance and that should nullify the effect of that. And this court said under Rule 52A, that wasn't enough to show harmless error. So that's number one. Number two, Mr. Bartrand, I believe, missed both when he said there's nothing explicit on the of the appendix. And this is at line three. This is Judge McNulty saying, for the record, I will vary down to a level eight, offense level eight, which is a guideline of zero to six months and impose the following sentence. But it certainly did tether his variance to a specific number of levels, which means that the errors in the step one analysis must have influenced the degree of the harmless error point. Even though that on page 49, what he really meant, I think, the same question. Right. And then he said it was a departure, but whether you call it a departure of variance, he's certainly doing it at a number of levels and not just saying at the end of the sentencing, for the 3583A factors, I'm picking a three-month sentence. Judge Amber, you said you wouldn't bet against Mr. Bartrand, but I want to, you know, that the sentence might be the same, but I do want to quote a sentence that I found from Dunnegan, which we thought... Make him put up his money on the bet first. I chose this for it, Your Honor. In Dunnegan, at the end of the opinion, the court said it is rational for a sentencing authority to conclude that a defendant who commits a crime and then herself in an unlawful attempt to avoid responsibility is more threatening to society and less deserving of leniency than a defendant who does not so defy the trial process. And I know we made that argument in our brief, not in those words, that if Judge Martini had to come to grips with the fact that Mr. Ray lied intentionally in an effort to secure an acquittal, he might not have been so generous with him at step three. I'll still make it back with you. Okay, I'm good for it too, Your Honor. He's feeling really good about bets right now because his Browns are having a heck of a better season than they have for quite some time. Just wait till this weekend when they lose to the Steelers. You're looking at a lifelong Jets fan, so I think enough said. Now, you asked me, whether I knew of other cases in which the defendant had already completed serving the sentence when this court granted a remedy on government appeal, and that there was a sentence imposed on remand that required the defendant to report back to prison. And I can, other than Jackson, I can cite two more. I don't have the sites now, but I will supply them. Absolutely. The Black case, which I think is from 2007 or 2008, was an appeal from a lenient sentence in a child pornography case, and I believe the defendant was already out when this court sent the case back. And Ramey was a similar, more recent case, an appeal from a lenient sentence in a child pornography case, and the defendant there too was out. I will try to follow up with a letter with the specific sites, but those are the three, those two plus Jackson are the ones I'm aware of. That's all I have. I thank the court for time. I ask you to vacate and remand. We thank both of counsel, not only for their helpful briefs and their vigorous arguments here, but also for their willingness to appear. And I hope that it was clear to you from the outset that by no means were you being compelled to be here, but it was your choice as whether you wish to argue in open court or from afar, as has become our usual practice. But we thank you both.